May it please the Court, Steve Sadie, for the testimony of Mr. GARCIA-BELTRAN. Mr. GARCIA-BELTRAN moved to suppress evidence of his identity that he asserted was the result of a race-based INS sweep. What exactly was he trying to suppress? Statements? Fingerprints? Yes, everything. What was listed in the motion to suppress? The motion to suppress, which is at C.R. 22, listed statements, fingerprints, and all results, all products, all fruits of that illegal detention. And what did you believe that to be? I think that includes everything in this case. Was that his immigration file? Yes. And the reason for that is... You don't contend that his answer to the question, what's your name, you don't contend that that's suppressible, do you? I do. And this is a very critical difference between this case and Pargis Rosa and Guzman Bruno. And that is, in both of those cases, the initial contact was lawful. If we look back to the statement of facts, which are very brief in both of those cases, they say that they initially approached the person, got the identification, and then the unlawful arrest occurred. That's why this case is different from those cases and governed by Davison Hayes. How do we know what happened here? We know what happened here because the burden is on the government to establish any exception, because this is a warrantless arrest. So the government has conceded an unlawful detention. There is no evidence that any aspect of this case was lawful. So unlike any of those other cases, there was never a name that was obtained. As in Hayes and as in Davis, the only evidence of the defendant's identity and connection to the offense is the product of the illegal arrest and detention. And that's why this case requires suppression. What do we do with the language in Guzman Bruno when we say there is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity that merely leads to the official file or other independent evidence? Quoting Orozco and Hunzilapa. Those are all – those are – again, those are cases where the identity initially came to the attention of the officers lawfully. This does not involve that, and there has been no overruling of Lopez and Hayes. The other two reasons that that case is – that Guzman Bruno is distinguishable is – It would be helpful if you could tell me how we know that about those cases. As you know, both in this case and in those cases, the facts are awfully slender. Yes. In the – at page 421 of Guzman Bruno and 1211 and 1212 of Pargas Rosa, they both set out the initial contact of having been in the course of an investigation with suspicion. They had a warrant. They saw the person along with other people they were suspecting, went up, got the initial identity, and then had the illegal arrest. And the way we know that is because at the district court, unlike in this case, in both of those cases, they granted the motion to suppress. They suppressed evidence and then found that other evidence had an independent source, the independent source being is they had the name, they could go to the fire. But if they don't have the name initially – Suppress somebody's name. The same way that you suppress the fingerprint in Davis and Hayes, that you take a flat-out Wong-Sun fruit-of-the-poisonous-tree. Can you put in any evidence, if it's tainted, if it's the result of exploitation of that illegal arrest, can the government bear the burden of showing an independent source or attenuation? And the footnote in Cruz I think is critical here, because when Cruz says, look, Wong-Sun says that it applies the same way for identification type of testimony. If you can get it, fine. If you can show that there's an independent source, it comes in. I've heard that the police, you know, approach somebody on the street and say, what's your name? Not a thing if it's consensual. And that's where the government has a burden of proving that that's a consensual contact or that there's a reasonable suspicion based on – Apparently here they say that the officer had – thinks that he had an IMS agent with him at the time. Conducting a sweep. And I think that that's one of the reasons why this case is so important. And that is – What they said, what's your name? Do you have any immigration – do you have an immigration – do you have an immigration visa? That's unlawful unless it's – unless the government bears the burden of proving consent or a reasonable suspicion based on articulable facts or probable cause. That's unlawful. Well, they can certainly go – I mean, there are cases holding that they can certainly go up to them and ask them that question. Right? No. Not – the government has a burden of showing that that's a consensual encounter. And they did not bear the burden. They come up to me and say, what's your name? And the person can say, I don't want to tell you and walk away. Not that it's a consensual encounter, but that it's not a seizure. Right. Seizure is the operative language. The government bears the burden of showing that the – any – that the contact is – that results in evidence is the product of exception to the warrant requirement. The government – Let me just go up and ask. Is there a Supreme Court case specifically holding that you can go up and ask a question and say, what's your name? The person doesn't have to answer the question. And then you get into a seizure issue if they try to make them answer the question, make them stay there. But if you walk up to somebody and say, what's your name, he can either answer it or he can walk away. But asking the question is not a seizure. The doctrinal basis for that admission is that those are voluntary conversations. I believe that that's the – The doctrinal basis is that it's not a seizure. I mean, you're trying to characterize something. And I would be doing the same thing if I were standing where you are. But the doctrinal basis is unreasonable search and seizure. Yes. No seizure. We don't care what happens in Fourth Amendment terms. No seizure. No search. Forget the Fourth Amendment. And in this case, there is no evidence that any evidence came in as the product of a questioning other than as the product of an – of an INS sweep. Did he know that he even did give his name? I thought he didn't give – did he give his name or did he in fact not give his name? There is no evidence that he gave his name. And I believe that it was the – that under the facts of this case, the judge found based on the proffer, it's the product of an INS sweep. A sweep by its nature is investigative in purpose and coercive in nature. I don't – I think that a seizure that results in identification information during an INS sweep is the heart of the type of evidence that has to be suppressed. Otherwise, there is no consequence for agents going through and doing grand sweeps, picking up lawful aliens, folks that they suspect or might be or have a hunch of. There's a consequence. They couldn't use this – this print to say, okay, run this guy against burglaries. I mean, then you begin to get into Hayes and Davis and that kind of stuff. But all they did was say, who is this? If the purpose of the INS sweep is investigatory to investigate and the product of that is the person's INS file, that under basic fruit of the poisonous tree, that's an exploitation of the illegal conduct act. And the first idea of criminality is from the unlawful contact, not the case like where they have the information in the past and they match it up. If somebody sees him in the police station and says, hey, that's the mass murderer that I told you about yesterday. Then what we do is we have an analysis. We have doctrines from the Supreme Court to tell us, is there an independent source? And that's the type of analysis that goes forward. The cases seem to hold that there's this language about you can't suppress the body. And one of the observations here is that identity is used in many different senses in the case law, and that's a lot of the confusion. Exactly. But something is not suppressible. And let's assume it's at least the guy's physical body. So apparently they can bring the guy into the courtroom. They can bring him into the courtroom. Right. And suppose they bring him into the courtroom and somebody walks in and says, oh, that's Garcia Beltran. The question, objection, Your Honor, can you prove an independent source from the primary illegality? If the government carries its burden, it comes in. If they can't, it's suppressed. This is standard. Just because it's a 1326 case doesn't mean that the defendants have less rights than in murders, rapes and burglaries. The reason 1326 cases are hard is because the crime and the identity issue start to merge. In other words, in the Davis and Haynes case, what you mean by identification is not who is this person, but is this the person who did X. But they knew who the person was from the beginning. They weren't fingerprinting to find out who he was. They were fingerprinting to find out when he was the guy whose fingerprints were over there. It's worse. They were fishing for – they were fishing among folks they thought might be illegal aliens. I'm just probing the meaning of identification in that context and in this one. And I think it's a very difficult area because it creates – there's – I think that if you read those cases, Guzman and the other cases, it's simply saying identity means summons into court. That's really what it means and that's what it's saying. And that's why it doesn't apply here, because we're only trying to suppress the fruits. And, of course, the most basic part of this is that there is an exception recognized in all of the cases, especially this Court's case in Oriague, which basically say that where you have an egregious Fourth Amendment violation, race-based detention. That's what we have in this case. I'm not sure that this was race-based. INS sweep. And the first words out of the mouth of the – in the motion to suppress, citing this Court's case in Camargo, Montero, saying that the reason was based on race. Nothing in response. I think – So you're at the – this was apparently – they stopped him at a – he was at a bus stop, a metro stop. Max, yes. I'm not familiar with what it would have been, but – Downtown light rail. So the allegation here is that they were just in the downtown area scooping and stopping everybody that was – That's what the record – Yes, that's what the record reflects. INS sweep. Your time is expired, but we'll let you save some to rebut. Thank you, Your Honor. And please, the Court. Mr. Sadie, first of all, Your Honor, I have a couple of arguments. I'll try to be brief. I think the issues are framed pretty well by the briefs. But with the – identity is kind of a tricky issue. And in thinking about oral argument today, I struggle with that. And I don't know really how much progress I made. But I think I did progress to the point where it's the government's position that where the only identity evidence is just to prove who it is that is in court. And whether that be through fingerprints, as in Pargus Rosas, or whether that be in the form of a statement in the case of Guzman Bruno, that this Court's decisions hold that that evidence is not subject to Fourth Amendment suppression. And that's really all that – You want to use the fingerprints here, Your Honor. Yes. You want to use the fingerprints to link him to his immigration file. That's correct. No – yeah. That is all that. Can't argue about that. If we weren't going to do that – If you could have his name – you could have his name. And with his name in the immigration database, you could find R. Garcia Beltran. You don't know whether – Well, I think, Your Honor, we still have a logistical problem in proving that the person named in those documents is, in fact, the person. And you need that fingerprint. The fingerprint is the most definitive way we have of proving identity. Sometimes they're photographs. Is there a photograph here? I don't know, Your Honor. I don't think so, but I can't tell you for sure. How is this different from the case that says you can't use the fingerprints to go out and investigate him for a burglary or a rape or a murder or something like that? Well, that's – that's – that's – You can't go out and investigate him for another crime. That goes back to the question of how fuzzy sometimes we – at least I sometimes use the word identification. But I think there is a difference. If, for instance, in the Davis-Hayes cases, the rape case, the burglary case, what the investigations did was to go out to the crime scene and find a fingerprint  I think they did here. They went to the database. Pardon? Ultimately, what they did here, they had a database of fingerprints. It wasn't the crime scene. It was the INS's database. And they required him to give them a fingerprint, which they then, as far as the record shows, for the purpose of matching it up against this outside source. Yes. I mean, there's no – I can't argue. That's the process of the 1326 prosecution. Well, Your Honor, I think that the difference is, in the burglary cases, they took the fingerprint and then used that fingerprint to go out and investigate the crime, which led to other evidence. In the 1326 case, there is a parallel. There is a parallel, and that is that we take the fingerprint and then, admittedly, we use that fingerprint to match the defendant to the documents that we're going to use to prove the illegal deportation. But that is what happened, Your Honor, in Pargas Rojas and Guzman as well. And this Court said, in those opinions, that just because fingerprint identification is used in that manner does not – I'm now back at the two cases. And it does appear in both instances that the – in one case, in Pargas Rojas, the initial encounter was part of a search, which – a probable cause search where the guy was present. And, in fact, the fingerprint that was tried to be suppressed was one that – not the original one, but one that was gotten later. No. Much later. And in the other case, it appears that at least the original stop, and it seems, although it's not that clear, some interchange that gave him some identity information was for reasonable suspicion. Here, there was nothing. I mean, your argument here would allow the INS to go out, pick up anybody on the street, take them in and fingerprint them to see if they were illegal aliens, right? And if they were, prosecute them. Well, I don't know that we have to reach that. Well, why? But what I am arguing, Your Honor, is that both Guzman Bruno and Pargas Rojas, my reading of those, assumes that the arrest is unlawful. But the arrest may have been unlawful, but the connection of the fingerprint to the arrest or the identity to the arrest, some identity information seems to have been gotten in a non-illegal situation before the illegal arrest. Well, I think that was Mr. Sady's argument. I would disagree. Specifically, in Pargas Rojas, I believe the arrest occurs in February of 1999. The fingerprint that was used, which followed from the unlawful arrest. But there was some identity information. They had to ask to name something. But, Your Honor, I don't think so. I think that was the Guzman Bruno case. All right. What about the answer to my question? Why isn't your position that you can just walk down the street, pick up anybody? Let's leave the race-based part aside. All right. Pick up anybody and take them down to INS headquarters in Fringlepoint to see if they show up on an INS database and if they do arrest them. What I am suggesting is that if the only objection to the fingerprint evidence is the unlawful arrest, that this Court's holdings are that that unlawful arrest pardon me, Your Honor, I'm sorry. That's correct. They could do that. They could just come pick up anybody, take them. If there's a match, they can prosecute them and they can't complain that it was an illegal arrest. The answer has to be yes. Of course, they could get sued under 1983. Well, the answer has to be yes. But I don't think you have those kinds of egregious circumstances here. I mean, I appreciate where you're going. The answer is yes in terms of suppressing the identity, but the answer is watch out under a 1983 lawsuit. That's correct. But if I could just briefly return to my position, which is that I think the issue is really does the identity evidence come in even if there is proof or a concession, as there was here, that the arrest is unlawful? And I think this Court's cases answer that question in the affirmative. I think Pargis Rosas, Guzman, Bruno. Pargis Rosas does seem to draw a distinction between investigative and original identity, a sort of routine booking type stuff. And we don't know what this means. We have no facts. Well, we may not. And this is the blurry line that you were the – you didn't use those words, but it was something like that, the confusion about identity. And that's something that this Court may have to wrestle with in fashioning a rule in this case. Do you have a basic fingerprint exemplar that you start with on this person? I mean, they called him in. They took his prints. Yes. Is that what it was, was a booking exemplar? Your Honor, I'm not sure that – Do you know that? No, no. I'm not sure the record shows that. It was a fingerprint that was taken at or near the time of his arrest, whether it was during the booking process or whether the immigration service took it. Pardon? I think the record indicates, Your Honor, that the INS took the fingerprint. Now, was he booked in an INS detention facility? I doubt it. I'm being cautious. I'm afraid I'm getting outside the record. The normal practice would be these folks would be taken to – there is a Multnomah County detention center. The immigration service uses that. It's a local. Everybody uses that. But the officer wasn't even certain, the local police officer wasn't certain that he had an INS officer with him at the time of the stop. No, he wasn't. And we just didn't – I think there was a – I think I was with him. What was he taken in for? The only records we had, Your Honor, the only records that were produced was that he was arrested and that the – there was a police report that the police officers thought maybe an INS agent was with him and maybe it was an INS suite. Was this in Portland? Portland, Oregon. I thought you had a police chief down there who refused to cooperate with the Federal Government. We have a new one now. Mark Croker's gone. Mark Croker's gone. What was he arrested for? I don't think we know. I think you'd be on very solid ground. This is just – I'm just fulminating. If the guy got busted somehow by the local police, they took him in, they booked him, they had a fingerprint exemplar from the booking, and then somebody said, hey, you know, and then they used that. But if the local cops are taking the guy in and then they bring the INS in to investigate the guy and they're the ones that take the print, then it begins to sound like an investigation of a crime like Hayes and Davis. I'm getting – We just don't know what we got here. We don't know exactly, and I'm getting to my sum-up time, so I guess I would conclude by saying this. Under Pargis Rosas, Guzman, Brewer, and Lumetap, even assuming an illegal arrest, all of those cases say we could nonetheless take a fingerprint from the defendant. The exemplar – Pargis Rosas said if you were doing it for – to identify the person, not if you were doing it for investigatory purposes. Yes. The INS may have been doing it for investigating purposes. Yes. But please, when the Court's analyzing that, remember that in Pargis Rosas, going back to your earlier question, it was precisely that exemplar that was used by the government to tie the defendant in the courtroom to the INS documents. So you're saying – This case is indifferent. In the Ninth Circuit law, you win. That's pretty much your argument. That's not a bad argument. In the Ninth Circuit, who knows? Who knew? Thank you very much, Your Honors. Thank you. Thank you, counsel. Mr. Sadie. I lost Mark Croker. Three points, Your Honor. First, the motion was to suppress all evidence. The government had the burden of establishing anything that they could – that was not the product of the illegal search. On page 5 of the excerpt of record, the government states that they would not seek to use any statements the defendant made. Second, on Pargis Rosas – Do you think that – oh, go ahead. I'm sorry. I'll ask you afterwards. In Pargis Rosas, I'm reading from the part that I just cited to the Court in my argument that he's initially contacted while they're executing a warrant, asked for identification, he produces a photocopy of a green card. So that's before any illegal arrest occurs, there's any allegation of illegality. So there's no question that Guzman Bruno and Pargis Rosas both involve an initial obtaining of the name in a lawful manner. Third is the reference – The fingerprint was obtained after what was treated as an illegal arrest. Yes. And that was obtained later. And they specifically talk about suppressing evidence that was the product, which did not happen here. They said we have to suppress the product. And then they found that there was an independent source, a matching between the name and the files, which allowed them to take the – to say that the identification on the 24th, that fingerprint, was a separate non-investigatory. Here, everything is the product of the investigatory purpose of the INS sweep. Last, there's the mention of the 1983 as a potential remedy. And as somebody who has litigated this type of cases in the LeDuc case, the Nicasio case from this Court, those cases are inhumanly difficult. You have – how do you go in with – where the witnesses are mostly people who are scared silly of the government, who – where they're often very difficult to keep in one place, and it's hugely expensive when you're litigating against the government. There is not a good option. This Court is the only defense to the Fourth Amendment in this context. So what exactly are you asking us to do? Are you asking us to go on bonk and drop the Eighth Circuit position? Or are you asking us to wind our way through the Ninth Circuit cases and you think you can win under them? I want to win right here. If I can't win right here, I want to go on bonk. But I think I can win right here, and I think I've given you three good reasons we can do that. It's investigatory purpose ab initio in this case. It's egregious Fourth Amendment violation based on race-based conduct. And those other cases involve equating identity with the body. We never said we wanted to suppress the body. We said we only wanted the fruits. And so what I'm asking for is an order reversing the denial of the motion to suppress, saying that it's granted and that all evidence obtained in exploitation of the primary legality must be suppressed. Thank you, Counsel. Thank you, Your Honor. The fall 1983 plaintiff said, you as a lawyer, maybe they do better. Thank you both. The case is now in order to submit. We'll call the final case on the calendar, which is United States v. Williams. Thank you.
judges: Trott, Paez, Berzon